# United States Court of Appeals

## For the First Circuit

No. 02-2198

UNITED STATES,
Appellant,

v.

MICHAEL L. CARUCCI,
Defendant, Appellee,

---

No. 03-1158

UNITED STATES,
Appellee,

v.

MICHAEL L. CARUCCI,
Defendant, Appellant,

---

No. 03-1244

UNITED STATES,
Appellant,

v.

MICHAEL L. CARUCCI,
Defendant, Appellee.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Robert E. Keeton, U.S. District Judge]

---

Before
Lipez, Circuit Judge,
Campbell, Senior Circuit Judge,
and Stahl, Senior Circuit Judge.

---

Michael G. Weinberg, with whom Oteri, Weinberg & Lawson, were on brief, for Michael L. Carucci.

Demetra Lambros, Attorney, with whom Michael J. Sullivan, United States Attorney, Richard L. Hoffman, Assistant United States Attorney, and James D. Herbert, Assistant United States Attorney, were on brief, for the United States.

---

April 13, 2004

---

**STAHL, Senior Circuit Judge**. Defendant-appellant Michael Carucci was a real estate broker and a business associate of Stephen Flemmi, the notorious leader of Boston's "Winter Hill Gang." Carucci and Flemmi were indicted on charges relating to money-laundering, but only Carucci's case was tried. Both during and after the jury trial, the district court, pursuant to Fed. R. Crim. P. 29, entered judgments of acquittal on dozens of the charged counts. Ultimately, Carucci was found guilty of two counts of engaging in monetary transactions in criminally-derived property in violation of 18 U.S.C. § 1957.

On appeal, Carucci contends that the evidence was insufficient to establish criminal liability under the statute, and challenges the trial court's "willful blindness" instruction to the jury. The government cross-appeals, contending that the district court erred in entering the post-verdict judgments of acquittal; in ordering a conditional new trial should the Rule 29 rulings be reversed; and in sentencing. For the reasons set forth below, we reverse Carucci's conviction on the two counts and affirm the district court's judgments of acquittal on the remainder.

## I. BACKGROUND

A.        Factual history

We set forth the facts underlying Carucci's convictions in the light most favorable to the verdict. See United States v. Diaz, 300 F.3d 66, 69 (1st Cir. 2002).

-3-

          1.     238 Marlborough Street

          Carucci's company, Group Boston Real Estate, managed a
building at 238 Marlborough Street in Boston.  One of the owners of
the property expressed interest in selling, and Carucci offered to
help find a buyer.  In 1991, Carucci submitted a bid from Flemmi.
During the negotiations, the seller asked Carucci where Flemmi's
money was coming from, and Carucci told them it was from lottery
winnings.  Flemmi, however, told others that the money was from a
family trust.  A few months after the sale, Carucci told the seller
that the money had come from Flemmi's family.

          In the course of the property sale, Carucci referred
Flemmi to Anthony Summers, a real estate lawyer.  At trial, Summers
testified that in September, 1992, Carucci asked Summers whether he
thought it would be a problem to sell real estate to Flemmi.
Summers responded, "as long as he did everything legally, that I
didn't think he'd have a problem."

          On October 2, 1992, the Marlborough Street deal closed
for $945,000.  Carucci, Summers, and Flemmi, among others, attended
the closing.  The purchaser was a nominee trust set up by Summers,
the "238 Marlborough Street Trust."  The trustees were Carucci and
one of Flemmi's sons, Stephen Hussey; Flemmi was the beneficial
owner.  Flemmi paid in cash with seven checks.  The checks were
drawn from different accounts, none of which bore Flemmi's name,

and different banks.  Three were payable to the Mary Irene Trust[1] (of which Flemmi was a trustee), three were payable to Mary Flemmi (Flemmi's mother) and one was payable to Jeanette Flemmi (Flemmi's ex-wife).  In conjunction with the sale, Summers drafted a mortgage evidencing a $975,000 loan from the Mary Irene Trust to the 238 Marlborough Street Trust.  The mortgage, on which Flemmi's name appeared, was publicly recorded.

Also on October 2, 1992, Flemmi and Carucci entered a joint venture agreement concerning the development and sale of the condominium units at 238 Marlborough Street.  Carucci invested $15,000 of his sales commission into the joint venture, and Flemmi handled the remaining costs.

2.    362 Commonwealth Avenue

In mid-1992, another real estate broker told Carucci that 362 Commonwealth Avenue in Boston, a commercial condominium containing a laundromat, was available as an investment property. Carucci submitted an offer on the property signed by Hussey as trustee of SMS Realty Trust and provided a binder check for $1,000 signed by him and drawn on the account of Group Boston.  He also participated in the sale negotiations.

---

[1]The money contributed by the trust constitutes more than half of the total payment and can be linked to a series of substantial cash deposits over a one-month period in 1982 at Winter Hill Savings Bank.

According to the purchase and sale agreement, the purchaser of the property was Jeannette Benedetti, trustee of Comm-1 Realty Trust. The agreement was signed by Benedetti and Karen Snow, Flemmi's daughters. On October 26, 1992, Carucci signed over to the listing broker a check for $5,125 from the Mount Washington Bank payable to Group Boston to serve as a deposit.

At the property closing on December 9, 1992, three checks were tendered as payment: a Mount Washington Bank check in the amount of $30,500 and a Hyde Park Savings Bank check in the amount of $70,000, both payable to Benedetti, and a $16,408.37 Winter Hill Federal Savings Bank check payable to Summers & Summers.

Prior to the closing, in November, 1992, Commonwealth Laundries, Inc. was formed, with Carucci and Flemmi as the major stockholders. Jian-Fen Hu, Flemmi's girlfriend, was president, treasurer, clerk, and director. On December 11, 1992, Commonwealth Laundries entered into a lease of 362 Commonwealth Avenue with Comm-1 Realty Trust. Hu and Benedetti (as trustee) signed the lease. Commonwealth Laundries borrowed $120,000 from the Mary Irene Trust to purchase equipment and $110,000 from Flemmi for improvements.

At trial, Flemmi's other son, William St. Croix, testified pursuant to an immunity agreement about his many years of criminal activity. He also testified that he first met Carucci at his father's home in Milton, Massachusetts, in 1990 or 1991. At

-6-

that time, Carucci told him he was going to broker the sale of the house. When St. Croix asked Carucci if he knew who his father was, Carucci responded, "Yes, everybody knows who your father is. Your father was the big guy." St. Croix testified that he visited Group Boston's offices "probably hundreds of times."

B.        Procedural history

On March 11, 1997, a grand jury of the United States District Court for the District of Massachusetts returned a 103-count indictment against Flemmi and Carucci. It charged both defendants with conspiracy to commit money-laundering in violation of 18 U.S.C. § 1956(h); substantive money-laundering offenses in violation of 18 U.S.C. § 1956; transactions in criminally derived property in violation of 18 U.S.C. § 1957; and RICO conspiracy in violation of 18 U.S.C. § 1962(d). In May 2001, as part of a consolidated plea in another case, Flemmi pleaded guilty to an information that encompassed the money-laundering conspiracy charges and the charges against him in this case were dismissed.

In March and April, 2002, Carucci alone was tried before a jury. At the close of the government's case, pursuant to Fed. R. Crim. P. 29(a), the district court granted Carucci's motions for judgment of acquittal on counts 1, 14-66, and 76-103. It then submitted counts 2-13 and 70-75 to the jury. These counts charged violations of §§ 1956 and 1957 and concerned the laundromat venture. Specifically, counts 9-13 and 73-75 related to the

purchase of the condominium, and counts 2-8 and 70-72 related to the purchase of the laundry equipment.

On April 16, 2002, the jury returned a verdict finding Carucci not guilty on the § 1956 counts (2-13) and guilty on the § 1957 counts (70-75). At a post-verdict hearing, the district court granted judgment of acquittal on counts 70-72 and 74, and provisionally granted a new trial on those counts. This left standing only the verdicts on counts 73 and 75, which concern, respectively, the December 9, 1992, transfer of a Mount Washington Bank check in the amount of $30,500 and a Hyde Park Savings Bank check in the amount of $70,000.

On December 20, 2002, the district court sentenced Carucci to ten months in the custody of the Bureau of Prisons, with a recommendation that Carucci serve his sentence in a community confinement center (CCC), followed by twenty-four months of supervised release. The same day, the Department of Justice announced that the Bureau of Prisons would no longer permit CCC placement for more than ten percent of the sentence imposed. On December 31, 2002, the district court revised the sentence to encompass five months' incarceration and five months' home confinement.

## II. **DISCUSSION**

A.          Carucci's challenge to his conviction under
            18 U.S.C. § 1957

          Carucci contends that there was insufficient evidence to
convict him on counts 73 and 75, which charge him with engaging in
monetary transactions in criminally-derived property in violation
of 18 U.S.C. § 1957.  We review Rule 29 determinations de novo.
United States v. Boulerice, 325 F.3d 75, 79 (1st Cir. 2003) (citing
United States v. Carroll, 105 F.3d 740, 742 (1st Cir. 1997)).  We
will affirm the conviction if, "after assaying all the evidence in
the light most amiable to the government, and taking all reasonable
inferences in its favor, a rational factfinder could find, beyond
a reasonable doubt, that the prosecution successfully proved the
essential elements of the crime."  Id. (quoting United States v.
O'Brien, 14 F.3d 703, 706 (1st Cir. 1994)).

          To establish a violation of 18 U.S.C. § 1957, the
government must prove that (1) the defendant engaged or attempted
to engage in a monetary transaction with a value of more than
$10,000; (2) the defendant knew that the property involved in the
transaction had been derived from some form of criminal activity;
and (3) the property involved in the transaction was actually
derived from specified unlawful activity.  18 U.S.C. § 1957(a)(1).[2]

_____

          [2]18 U.S.C. § 1957(a)(1) states, in relevant part:
"Whoever . . . knowingly engages or attempts to engage in a
monetary transaction in criminally derived property of a value
greater than $10,000 and is derived from specified unlawful

Subsection (c) of the statute provides: "the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity." Id. § 1957(c). In other words, a defendant may not be convicted under § 1957(a) unless he knew that the transaction involved "criminally derived property," but he need not know that the property was derived from the "specified unlawful activity." United States v. Richard, 234 F.3d 763, 768 (1st Cir. 2000) (quoting United States v. Gabriele, 63 F.3d 61, 65 (1st Cir. 1995)) (internal quotation marks omitted).

Carucci maintains that the evidence as to each of these elements is insufficient to support conviction on counts 73 and 75. We need not address the first two requirements of § 1957, because we hold that the government did not adduce sufficient evidence that the purchase of 362 Commonwealth was derived from proceeds from specified unlawful activity. We explain below.

1.    Scope of the specified unlawful activity

A threshold issue on appeal is the scope of the specified unlawful activity ("SUA") charged to the jury. The indictment set forth four SUAs as underlying the §§ 1956 and 1957 charges: drug trafficking, extortion, loan sharking, and gambling. During the charge conference, the district court ruled that there was

activity, shall be punished . . . ."

-10-

insufficient evidence to submit loan sharking and drug dealing to the jury.

In the jury charge, however, the court's instructions were inconsistent. During two occasions in the charge, the court instructed that all four crimes constituted specified unlawful activity. First, it stated:

> You are instructed that the offenses of conducting an illegal gambling business, engaging in extortionate credit transactions, interference with commerce by extortion, and distribution and conspiracy to distribute narcotics . . . constitute specified unlawful activity . . .

Later, after reciting the four offenses again, the court instructed:

> Each of the crimes just listed qualifies as specified criminal activity. Thus, if you find beyond a reasonable doubt that any of the funds involved in the transactions listed in the indictment derived from the commission of any of these crimes by any person, then the transactions involved proceeds derived from specified criminal activity.[3]

The court then stated that it would provide further details as to the elements of the SUA offenses later.

In the context of instructing on §§ 1956 and 1957, however, the court described only the elements of extortion and gambling. As to those two offenses, it stated that it was

_____

[3]This instruction was given during the portion of the charge dealing with the § 1956 claim. It was expressly incorporated into the portion concerning § 1957.

-11-

instructing the jury "as to the elements of the offenses listed as specified unlawful activity in the indictment . . ." It set forth the elements of extortion and gambling that the government had to prove beyond a reasonable doubt in order for the jury to find a crime "from which Flemmi derived illegal proceeds." The court did not state the elements of loan sharking or drug trafficking, and did not mention those offenses again.

Carucci maintains that the district court's failure to set forth the elements of drug trafficking prevented the jury from basing a § 1957 conviction on that SUA.[4] We need not decide this issue because, even assuming that the jury was instructed correctly, there is insufficient record evidence that the funds used in the real estate transactions were actually derived from the specified unlawful activities, as opposed to other criminally derived proceeds. See section II(A)(2), infra.

2.    Evidence of specified unlawful activity

As discussed supra, the statute requires proof that the property involved in the transaction was actually derived from specified unlawful activity. 18 U.S.C. § 1957(a). Application of this requirement is not always straightforward. This circuit and others have held that § 1957 convictions necessitate proof beyond

---

[4]At oral argument before this court, the government expressly abandoned its argument that loan sharking constituted a SUA for purposes of the § 1957 charge. Accordingly, we do not consider it further.

a reasonable doubt of the predicate crime. See, e.g., United States v. Burgos, 254 F.3d 8, 14 (1st Cir. 2001) (stating that in order to convict the defendant of money-laundering, "the government had to prove that he had attempted to distribute cocaine to satisfy the specified unlawful activity element of the crime" (internal quotation marks omitted)); United States v. Lovett, 964 F.2d 1029, 1041-42 (10th Cir. 1992) ("the elements of the particular 'specified unlawful activity' . . . are essential elements that the prosecution must prove in order to establish a violation of § 1957"); see also United States v. Blackman, 904 F.2d 1250, 1257 (8th Cir. 1990). However, proof of a specific, individual underlying offense -- i.e., a particular unlawful mailing in a mail fraud SUA, or a particular drug sale in a drug trafficking SUA -- is not necessary to support a § 1957 conviction. See United States v. Richard, 234 F.3d 763, 768 (1st Cir. 2000); United States v. Mankarious, 151 F.3d 694, 701-02 (7th Cir. 1998). Rather, circumstantial evidence may suffice to allow a jury to infer a predicate act from an overall criminal scheme. See, e.g., Mankarious, 151 F.3d at 702-03; United States v. Jackson, 983 F.2d 757, 766-67 (7th Cir. 1993); Blackman, 904 F.2d at 1257.

Even applying this broad construction of § 1957 liability, the evidence of specified unlawful activity adduced at

Carucci's trial was insufficient to support his conviction.[5]  We first consider the evidence of gambling and extortion, the two SUAs that were unequivocally charged to the jury.  During the extensive trial testimony, the only specific mention of either gambling or extortion was by Flemmi's son, St. Croix.  Initially, he testified as to his personal criminal history:

> Q: What other types of criminal activities have you been involved in?
>
> A: I have been involved in drug rip-offs, selling drugs, extortion, gambling, arson, operating an illegal club.

St. Croix then stated that Flemmi was involved in "some" of those activities, but did not specify which ones.  No other witnesses testified about Flemmi's participation in gambling or extortion, or about proceeds therefrom.  Thus, at very best, St. Croix's testimony fell short of stating that Flemmi engaged in gambling or extortion, and there was simply no other evidence on this critical point.

---

[5]The government attempted but failed to present additional evidence concerning the SUAs.  At trial, the district court excluded extensive testimony by government witnesses concerning Flemmi's participation in extortion, drug dealing and gambling schemes, as well as his lack of legitimate income.  The court determined that the proffered evidence was insufficiently linked to the transactions specified in the indictment and to Carucci's criminal liability. Additionally, the court held that some of the evidence suffered from hearsay and relevance problems.  The government's position on appeal is that the evidence that the district court allowed in was sufficient, standing alone, to support Carucci's § 1957 convictions.

St. Croix's testimony suffers from an additional weakness: it did not indicate a time frame in which the gambling and extortion, if any, occurred. In order to establish § 1957 liability, Flemmi must have derived proceeds from gambling or extortion before November 22, 1992, the last date money was deposited into the accounts on which the transactions at issue were drawn. See Mankarious, 151 F.3d at 704 ("A money launderer must obtain proceeds before laundering can take place."); United States v. Christo, 129 F.3d 578, 580 (11th Cir. 1997) (same).

After careful consideration of the record, we conclude that there was insufficient evidence for a rational jury to find that Flemmi derived proceeds from gambling or extortion before November 22, 1992. The gambling SUA, as the district court instructed, required proof beyond a reasonable doubt that Flemmi conducted a gambling business that (1) violated Massachusetts law; (2) was knowingly and intentionally conducted, financed, managed, supervised, directed or owned by five or more persons; and (3) which was either in substantially continuous operation for thirty or more days or had a gross revenue of $2000 or more on any single day. See 18 U.S.C. § 1955. Even if the jury could have reasonably inferred a violation of Massachusetts law, there was no evidence presented to the jury as to the second or third elements required for the specified federal gambling crime. Moreover, the term "gambling" is possessed of common meanings apart from the legal

definition.  See Webster's Third New International Dictionary 932 (1986).  Even if the jury believed that Flemmi was involved with "gambling," we cannot presume that it found that all of the elements of § 1955 were satisfied.

As to extortion, the SUA required the government to prove that (1) Flemmi knowingly and willfully obtained property from the victim by means of extortion; (2) Flemmi knew that the victim parted with property because of extortion; and (3) the extortion affected interstate commerce.[6]  18 U.S.C. § 1951.  Again, no evidence was presented to the jury as to these elements.  As with gambling, St. Croix's equivocal identification of Flemmi with only "some" of his own criminal activities fell short of indicating that "extortion" was one of them.  Furthermore, even if the jury could reasonably surmise from St. Croix's use of the terms "gambling" and "extortion" that Flemmi's conduct satisfied the statutory elements of those offenses, there is no evidence linking it to the relevant accounts during the relevant time period in the relevant amount.

As to the SUA of drug trafficking, the government points to two pieces of evidence purporting to link Flemmi to drug trafficking proceeds.  First, St. Croix testified that a drug dealer named Johnny Debs agreed to purchase $100,000 of cocaine from him in the late 1980s.  He stated that Debs knew nothing about

---

[6]It appears to be undisputed that it is Flemmi's criminal conduct that is at issue for purposes of § 1957, not St. Croix's.

-16-

St. Croix, but approached him because of Flemmi's reputation as a narcotics dealer. Second, St. Croix testified that he took drugs from dealers whom he promised to pay after selling the drugs. He did not intend to repay the dealers, however, and said he instead "would divvy it up with people that I was involved in and later my father." (It is not entirely clear from the testimony whether this scheme was merely a plan, or whether the "divvying" in fact took place.) St. Croix also testified that he was involved in drug trafficking from 1989 to 1997.

Assuming without deciding that this evidence shows that Flemmi engaged in drug trafficking, it falls short of establishing that the funds used in the real estate transactions were actually derived from drug funds as opposed to other criminally-derived proceeds. As with gambling and extortion, there is no evidence as to the amount of proceeds or the specific time frame in which the proceeds were conveyed to Flemmi. Indeed, the fact that St. Croix specified that any sharing with Flemmi happened "later" suggests that Flemmi was unlikely to have derived drug-trafficking proceeds before the 1992 transaction. Accordingly, to infer from this testimony that at least $10,000 of the funds involved in the real estate transaction in 1992 were derived from Flemmi's drug trafficking is too great a stretch.

The government points to evidence of Flemmi's leadership of an organized crime gang and apparent lack of legitimate income

-17-

to support the SUAs.  It argues that the testimony that Flemmi was a leader of the Winter Hill Gang "told the jury much about Flemmi and his money."[7]  The government also points to the fact that Flemmi's parents had meager incomes and lived frugally, and hence could not have provided any money to Flemmi for the purchase.

While these factors certainly suggest criminally derived income in a general sense, the evidence fails to supply a link to gambling, extortion or drug trafficking specifically.  Accepting that Flemmi's income was illegitimate, it could have been linked to any number of criminal activities; to conclude from this evidence that Flemmi derived proceeds from the specified SUAs is simply too speculative.

Moreover, a § 1957 conviction cannot be based solely on the finding that a known criminal had no other legitimate income. Blackman, 904 F.2d at 1257.  In the cases cited by the government, courts generally affirm money-laundering convictions only where such evidence is accompanied by additional, more specific indicia of criminal activity.  See, e.g., United States v. Hetherington, 256 F.3d 788, 794 (8th Cir. 2001) (evidence of defendant's awareness that his company's "entire operation was based on deceit"); United States v. Eastman, 149 F.3d 802, 804 (8th Cir.

---

[7]The government also goes into some depth as to St. Croix's involvement with drug dealing and extortion and expressly urges us to apply the saying "like father, like son."  None of the evidence concerning St. Croix's conduct supports a conclusion that Flemmi himself engaged in the SUAs.

1998) (evidence of defendant's illegal drug purchases, and evidence that the money defendant provided for transaction had a drug scent); United States v. Meshack, 225 F.3d 556, 572 n.12 (5th Cir. 2000) (evidence of drug transactions at defendant's restaurant); United States v. King, 169 F.3d 1035, 1039 (6th Cir. 1999) (evidence that defendant "coordinated a multi-person drug distribution business").

The government also contends that Flemmi's use of cash and money orders -- as well as his use of multiple banks, multiple checks, and nominee trusts -- supports the inference that the transactions were derived from SUAs. Again, this evidence does not establish a sufficient nexus to the specified SUAs. While it is true that a suspiciously structured financial transaction can constitute circumstantial evidence of money-laundering, the cases cited by the government consistently feature additional evidence of unlawful activity. See, e.g., United States v. Smith, 223 F.3d 554, 577 (7th Cir. 2000) ("Witnesses testified that Wilson personally bought and sold drugs, so the jury knew that he had illegal cash sloshing around that could have been used."); United States v. Reiss, 186 F.3d 149, 152-53 (2d Cir. 1999) (in convoluted sale of airplane, an associate who was "heavily involved in narcotics trafficking and money laundering in the United States" facilitated the transaction). Here, there is no comparable

evidence that Flemmi had engaged in the specified SUAs in the relevant time period.

In sum, the evidence in the § 1957 case against Carucci is simply too thin. While Flemmi's apparent lack of legitimate income and the structuring of his financial dealings certainly suggest criminal activity, the government failed to prove a nexus to the alleged specified unlawful activity, much less to the accounts involved in the transactions at issue. Carucci's convictions on counts 73 and 75 cannot stand.[8]

B.      The government's cross-appeal

We now turn to the government's cross-appeal. The government contends that the district court erred in allowing Carucci's motion for acquittal on counts 70 through 72 and 74, which set forth additional violations of § 1957. (Counts 70 through 72 related to the purchase of the laundry equipment; count 74 related to the purchase of the condominium.) As grounds for its decision, the district court stated that there was insufficient evidence to establish that Carucci knew that the property involved in the transactions had been derived from criminal activity.

As noted supra, we review Rule 29 determinations de novo. Counts 70-72 and 74 are fatally undermined by the government's failure of proof as to § 1957's requirement that the transactions

---

[8]Accordingly, we need not deal with the other issues Carucci raises on appeal, including the adequacy of the jury instructions.

-20-

at issue were derived from specified unlawful activity. As discussed supra, no reasonable jury could conclude that the purchases of the equipment or condominium involved proceeds from Flemmi's gambling, extortion, or drug trafficking. Accordingly, we affirm the district court's grant of Carucci's Rule 29 motion, albeit on different grounds.[9]

### III. CONCLUSION

For the reasons set forth above, we **reverse** Carucci's convictions on counts 73 and 75 of the indictment and **affirm** the district court's judgments of acquittal on counts 70-72 and 74.

---

[9]As a result of this holding, we need not address the district court's award of a conditional new trial should the Rule 29 rulings be reversed. Nor do we address the sentencing issue raised by the government.