# United States Court of Appeals
## For the First Circuit

No. 04-1052

UNITED STATES OF AMERICA,

Appellee,

v.

HARRY A. BYRNE, JR.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Boudin, Chief Judge,
Lipez, Circuit Judge,
and Schwarzer,* Senior District Judge.

R. Matthew Rickman, with whom Frank A. Libby, Jr. and Kelly, Libby & Hoopes, P.C. were on brief, for appellant.
Connor B. Dugan, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, S. Theodore Merritt, Assistant United States Attorney, R. Alexander Acosta, Assistant Attorney General, and Jessica Dunsay Silver and Linda F. Thome, Attorneys, Department of Justice, Civil Rights Division, were on brief, for appellee.

January 11, 2006

_____

*Of the Northern District of California, sitting by designation.

**LIPEZ, Circuit Judge**. A jury convicted the defendant, a former Boston police sergeant, of one count of deprivation of constitutional rights and four counts of witness tampering. The charges stem from the defendant's assault on a 21-year-old college student and subsequent efforts to conceal that crime from investigators. On appeal, the defendant seeks a new trial on the ground that the district court improperly limited cross-examination of police officers who testified for the government. He seeks acquittal on the witness tampering charges because, he argues, there was insufficient evidence to support his convictions under Arthur Andersen LLP v. United States, 125 S.Ct. 2129 (2005), a case that we examine closely in response to his claim. Finally, he argues that United States v. Booker, 125 S.Ct. 738 (2005), requires a remand for resentencing. We affirm the defendant's convictions but vacate his sentence.

## I.

We review the facts as a reasonable jury could have found them, leaving certain details for discussion in connection with the defendant's claims of error. Because the defendant challenges the sufficiency of the evidence against him, we "eschew[] credibility judgments and draw[] all reasonable inferences in favor of the verdict." United States v. Sepulveda, 15 F.3d 1161, 1173 (1st Cir. 1993).

In September 2001, when the initial relevant acts occurred, Garret Trombly had just started his junior year at Harvard College. Trombly had grown up in Wilbraham, Massachusetts. He often spent weekend evenings with his boyhood friend Tom Davis, a Boston College junior. One Saturday night, September 9th, Davis hosted a party for a group of his friends from Wilbraham at his apartment on Commonwealth Avenue in Boston. Trombly arrived at about eight o'clock. Another native of Wilbraham, Maureen Leahy -- a sophomore on the Boston College women's basketball team -- arrived shortly before midnight. Almost immediately after Leahy arrived, the assembled friends left Davis's apartment to attend another party.

That evening, the defendant was serving as a patrol supervisor in Boston Police district fourteen, which included residences owned by Boston College, Boston University, and Harvard. The defendant and his subordinates, some of whom had been hired for the evening by Boston College as a "paid detail," were on the lookout for underage drinking.

As Trombly, Davis, and Leahy left Davis's apartment, the defendant appeared in his police cruiser. Apparently recognizing Leahy from the previous night, the defendant yelled at her from his cruiser window. During a tirade that lasted nearly five minutes, he called Leahy, who was not intoxicated at the time, a "stupid B.C. girl," a "drunk," and, when she began to cry, a "bitch." He

referred to her roommates, whom he had encountered the previous night, as "drunken sluts." After a few minutes, Davis put his arm around Leahy, who was crying hysterically, and attempted to walk away with her.

The defendant's anger then turned to Davis. He yelled "Don't turn your back on me, you fucking punk. Don't think I won't beat your ass. Don't make me get out of this car." Then, without any provocation, the defendant exited his cruiser. He approached Davis, getting close enough to bump the student in the chest. He asked Davis if he wanted to fight, and, when Davis declined, said he would "kick [his] ass" and "BC kids [are] faggots and . . . punks."

The three students began to walk away, down Commonwealth Avenue. The defendant followed in his cruiser, driving slowly, with the flashing lights on. Trombly, Davis, and Leahy soon were surrounded by four or five other students, some of whom pleaded loudly with the defendant to leave them alone. Trombly said to one of his friends, perhaps loudly enough for the defendant to hear, that it was not a police officer's job to make young women cry. At no point, however, did Trombly address the defendant directly. Nor did Trombly spit on the defendant, as the defendant later claimed. The defendant radioed for backup. Before the group of students had traveled more than a block from Davis's apartment, another police

-4-

cruiser arrived, driven by Boston Police officers Gregory Lynch and Kevin Peckham.

On arriving, Lynch and Peckham observed a group of students "just standing there" but no disorder or public drinking. The defendant radioed orders for Lynch and Peckham to arrest "the male with the Red Sox hat on." The two officers exited their cruiser and arrested Trombly. Pursuant to the arrest, the officers confiscated an unopened beer can and a cell phone from Trombly, who had been carrying both items in the pockets of his trousers. The officers noted that Trombly was not intoxicated. The defendant arrested Davis. Lynch and Peckham drove Davis and Trombly to the police station.

At the station, Lynch handcuffed Trombly and Davis to a pole next to the guard room, as was standard practice. A short time later, the defendant arrived at the station and ordered Lynch to unhandcuff Trombly -- who was the smaller of the two students, weighing about 150 pounds -- and bring him to the guard room. Lynch did so and left Trombly's cell phone, which he had been carrying, on a table in the guard room.

Only moments after being left alone in the guard room with Trombly, the defendant began yelling. Before Trombely could respond, the defendant punched him in the face. After Trombly protested that he had done nothing wrong, the defendant "grabbed" him by the throat and hit him again. Then the defendant shoved

Trombly across the room, causing him to fall over a bench. Startled by the resulting noise, Lynch looked back to see the defendant standing over Trombly. Then, while Lynch looked on, the defendant picked Trombly off the floor and "jamm[ed] him up against the wall." He yelled at Trombly again, this time saying "You little pussy. You fucking pussy. Your mother's a pussy, and your father's a pussy for not teaching you better."

Hearing the commotion, two other police officers, Jeremiah Harrigan and Kristine Straub, arrived in the guard room. Then, according to Lynch's testimony, which was confirmed by Harrigan and Straub, the defendant, who had both hands on Trombly's chest, "removed his right hand and slapped Mr. Trombly across the face." The defendant "then pushed [Trombly] backwards . . . into a wooden table . . . . The table flipped over, and Mr. Trombly fell to the floor." When the table flipped, Trombly's cell phone landed on the floor as well. The defendant "began to stomp on the cell phone," and "then picked [the phone up] and threw [it]" across the room. Thereupon, the defendant left Trombly in the care of the other three officers on the scene, each of whom would later testify that they had seen Trombly do nothing to provoke the defendant.

The officers booked Trombly and charged him, on the defendant's instructions, with drinking in public, resisting arrest, providing alcohol to minors, and assault and battery on a

-6-

police officer.  To cover himself, the defendant wrote an incident report in which he stated, falsely, that he had arrested Trombly himself, and that, as he was effecting the arrest, Trombly had "put his hands on me."[1]

At about five o'clock on Sunday morning, Trombly posted bail.  Almost immediately after leaving the police station, Trombly went to the hospital.  The doctor who examined him noted that he was unable to bite his teeth together and that he was having difficulty talking.  An X-ray revealed a severely fractured jaw, of

---

[1] The defendant testified to a different set of interactions.  He said that he arrested Trombly himself, after the student had spit on him, and that Trombly, in hostility to the arrest, "put his hands on me," by "swat[ing] away" his handcuffs.  At the station, according to the defendant, Trombly, once uncuffed, reached into his pocket for a "black object," which turned out to be his cell phone.  The defendant, "scared for [his] life" because he thought the cell phone "could have been a gun," "hit [Trombly] with . . . the heel of my hand . . . to get him under control" and then "pinned" the student against a wall.  While Trombly was restrained, the defendant "pried [the cell phone] out of his hand and threw it behind [himself], and it hit the wall."  Then the defendant told Trombly to "cut the shit," called Trombly and his father "pussies" (but said nothing about Trombly's mother), and began "spewing profanities" at the student because he had "just scared me."
    The defendant admitted that he told Officer Straub that "there was no vicious beating and nobody had a broken jaw" and not to "talk about it in the station to just anybody."  He said that he told Officer Harrigan, "Just don't talk about it."  But, the defendant said, he told both officers to "tell the truth" if they were approached by investigators.  He testified that when he talked to officers Peckham and Lynch, he "told them the same thing I told Officer Straub and Officer Harrington."  He denied ever telling anyone to lie to or mislead investigators.
    The jury was entitled, of course, to discredit all or part of the defendant's testimony.  See, e.g., United States v. Gomez-Villamizar, 981 F.2d 621, 624 (1st Cir. 1992).

the type caused by "significant impact to the face," such as a car accident. Emergency oral surgery followed.

By the time Trombly appeared in court on Monday morning, his jaw had been wired completely shut. For the next two weeks, Trombly could not eat solid foods and could drink only through a straw. For a month after that, Trombly's jaw was wired partially shut, and he could eat only food that had been mashed.

The district attorney's office quickly dropped all of the charges against Trombly. Soon, though, reports of Trombly's treatment at the hands of the defendant appeared in the newspapers. In short order, an investigation commenced. At first, the police department's internal affairs and anti-corruption units handled the inquiry. On September 24, roughly two weeks after the incident, federal authorities began investigating the defendant's conduct.

In the weeks after the incident, the defendant directly or impliedly asked the officers who had observed his interaction with Trombly -- Peckham, Lynch, Straub, and Harrigan -- to lie to investigators. The defendant also asked Peckham to tell Lynch to say that "the incident never happened." Nonetheless, each of the four officers testified before a grand jury and at trial about the defendant's conduct and his attempts to cover it up.

## A.  Limitations on Cross Examination

The government called Officer Lynch as its third witness, after Trombly and Leahy.  On cross examination, the defendant sought to discredit Lynch's testimony by suggesting that the officer had contrived his story to placate the federal authorities.  In this vein, defense counsel elicited testimony from Lynch that he was not in court "voluntarily," and that he had been granted immunity in exchange for his testimony.  Defense counsel asked Lynch several questions relating generally to:  whether he felt intimidated by the federal authorities -- Lynch said no; whether he had been threatened with perjury charges -- Lynch denied that he had been; and whether he was concerned that others might think him untruthful -- he said that he was.

Defense counsel next asked Lynch, "Are you familiar with an officer by the name of Kenny Connolly?" [sic] -- a reference to a Boston Police officer who had been in the news recently and who had testified, according to defense counsel, "in a way displeasing to the government" before a grand jury and then was convicted of perjury and obstruction of justice.  See Conley v. United States, 415 F.3d 183 (1st Cir. 2005); United States v. Conley, 323 F.3d 7 (1st Cir. 2003).  Defense counsel hoped to suggest to the jury that Lynch and the other officers were testifying as the government

desired only because they feared that, if they did not, they might meet the same fate as Conley.

The government objected immediately, and the district court barred further "inquiry on this subject." Defense counsel then asked questions on the general topic of whether Lynch felt pressured by the government and whether he had been treated fairly. During this questioning, defense counsel was able to elicit Lynch's testimony that he had "in the back of his mind" a "concern[]" that the government would think him untruthful after his testimony.

The defendant contends that the district court's refusal to allow questioning about Conley deprived him of his Sixth Amendment right to confront the witnesses against him "on the fundamental issue of bias." "The Confrontation Clause . . . secures a right to cross examination in order to test 'the believability of a witness and the truth of his testimony.'" United States v. Gonzalez-Vazquez, 219 F.3d 37, 45 (1st Cir. 2000) (quoting United States v. Carty, 993 F.2d 1005, 1009 (1st Cir. 1993)). We evaluate preserved Confrontation Clause challenges to limitations on cross-examination in two steps. Each step involves a different standard of review. First, we review de novo the district court's conclusion that, even though cross examination was limited, the defendant was afforded "'sufficient leeway to establish a reasonably complete picture of the witness' veracity, bias, and motivation." Gonzalez-Vazquez, 219 F.3d at 45 (quoting

-10-

<u>United States</u> v. <u>Laboy-Delgado</u>, 84 F.3d 22, 28 (1st Cir. 1996)). If we determine that the defendant's "opportunity to impeach adverse witnesses" met or exceeded this constitutionally-guaranteed "threshold," we review for abuse of discretion the district court's decision "'to impose reasonable limits' on cross-examination in order to avoid confusion of the issues or extended discussion of marginally relevant material." <u>Gonzalez-Vazquez</u>, 219 F.3d at 45 (quoting <u>United States</u> v. <u>Twomey</u>, 806 F.2d 1136, 1139 (1st Cir. 1986)).

We conclude that the district court's prohibition on questioning about the Conley case did not deprive the defendant of his confrontation rights. By the time the court rebuffed his effort to ask Lynch about the Conley case, defense counsel already had probed the witness's "concern about liability." After the government's objection to questioning on the Conley case, the court allowed defense counsel to explore the issue of Lynch's fear of the government "one more time," with questioning that consumed several transcript pages. In all, questioning on the topic of Lynch's interactions with and fear of the government filled more than eleven transcript pages. Similar, if not as lengthy, questioning was repeated during the testimony of the other officers testifying for the government. (Defense counsel did not seek specifically to ask the other officers about the Conley case, maintaining that any such request would have been futile.) Once defense counsel had

explored the area sufficiently "to establish a reasonably complete picture of the witness' veracity, bias, and motivation" and had ensured that the jury understood his concerns about the witness, the district court was entitled to move the trial forward. Laboy-Delgado, 84 F.3d at 28 (internal citations omitted). See also United States v. Innamorati, 996 F.2d 456, 478 (1st Cir. 1993) ("Since a reasonable opportunity to test [the witnesses'] veracity and motive was offered, no Confrontation Clause issue is presented.").

Having rejected the defendant's constitutional claim, we must now determine whether the court's decision to bar questioning on the Conley case constituted an abuse of discretion. We conclude that it did not. We long have recognized that trial courts retain "'wide latitude to impose reasonable limits' on cross examination in order to avoid confusion of the issues or extended discussion of marginally relevant material." Gonzalez-Vazquez, 219 F.3d at 45 (quoting Twomey, 806 F.2d at 1139). Here, any discussion of the Conley case was at best marginally relevant, and easily could have confused the jury.

## B.  Sufficiency of the Evidence on Witness Tampering

Contending that the evidence was insufficient to support his convictions for witness tampering, the defendant preserved this challenge with a motion for a judgment of acquittal. Fed. R. Crim. P. 29(a). We review de novo the district court's denial of a Rule

29 motion.  United States v. Hernandez, 146 F.3d 30, 32 (1st Cir. 1998).  But, because it is the jury's job to determine what the defendant actually did, knew, and intended, we will conclude that the evidence was sufficient to sustain the conviction as long as a rational jury, making permissible inferences, could find beyond a reasonable doubt that the elements of the counts were satisfied. United States v. Carucci, 364 F.3d 339, 343 (1st Cir. 2004).

The defendant's argument rests, in large part, on his insistence that Arthur Andersen LLP v. United States, 125 S.Ct. 2129 (2005), imposes new evidentiary requirements on prosecutions under 18 U.S.C. § 1512(b)(3), which he was convicted of violating. We review the Supreme Court's holding in Arthur Andersen, evaluate the defendant's arguments, and then turn to the evidence.

1.  Arthur Andersen

In Arthur Andersen, the Supreme Court reversed a corporation's conviction for obstruction of justice, obtained under 18 U.S.C. § 1512(b)(2), and in so doing clarified some of the evidentiary requirements of that statute.[2]  Arthur Andersen established two things about § 1512(b)(2).  First, the Court concluded that in the statutory phrase

> Whoever knowingly uses intimidation . . . or
> corruptly persuades another person, or

---

[2] The defendant raises no challenge to the jury instructions (which were the issue in Arthur Andersen), nor does he contest the sufficiency of the evidence on the civil rights count.

-13-

> attempts to do so, or engages in misleading
> conduct toward another person with intent to—

"knowingly" modifies "corruptly persuades." <u>Arthur Andersen</u>, 125 S.Ct. at 2136.

Second, the Court held that a "'knowingly . . . corrup[t] persuade[r]' cannot be someone who persuades others to shred documents when he does not have in contemplation any particular official proceeding in which those documents might be material." <u>Arthur Andersen</u>, 125 S.Ct. at 2137. Consequently, in a prosecution under subsection (b)(2), the government cannot succeed if it fails to show a "nexus between the 'persua[sion]' to destroy documents and any particular proceeding." <u>Id.</u> at 2136. The Supreme Court recognized in <u>Andersen</u> that pursuant to 18 U.S.C. § 1512(f)(1) (2002)[3], "an official proceeding 'need not be pending or about to be instituted at the time of the offense.'" Nonetheless, as the Supreme Court cautioned, "It is . . . one thing to say that a proceeding 'need not be pending or about to be instituted at the time of the offense,' and quite another to say that a proceeding need not even be foreseen." <u>Arthur Anderson</u>, 125 S.Ct. at 2137. The Supreme Court analogized the situation in <u>Arthur Andersen</u> to the situation it had faced in <u>United States</u> v. <u>Aquilar</u>, 515 U.S. 593 (1995), where it found a similar "nexus" requirement in prosecutions for "corruptly endeavoring to influence, obstruct, and

---

[3] Formerly 18 U.S.C. § 1512 (e)(1).

impede a . . . grand jury investigation under [18 U.S.C.] § 1503." Arthur Andersen, 125 S.Ct. at 2137 (internal quotations and brackets omitted). In Aguilar, the Court said that, under § 1503, "if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct." 515 U.S. at 599.

2. Application of Arthur Andersen to § 1512(b)(3)

The defendant insists that everything the Supreme Court said about 18 U.S.C. § 1512(b)(2) in Arthur Andersen applies with equal force to his prosecution under 18 U.S.C. § 1512(b)(3). He says that Arthur Andersen requires that the government "establish a link between the specific intent of the defendant at the time of the [witness tampering] and a particular federal proceeding or investigation." The defendant also argues that Arthur Andersen adds, by reference to Aguilar, a requirement that "the government must prove . . . that [the defendant] was conscious that the individuals he is alleged to have persuaded were likely to communicate with . . . . officials who happened to be federal" (emphasis in original).[4]   On the basis of this argument, he

---

[4] We previously have held that a defendant need not "specifically know that the underlying conduct could constitute a federal offense." Bailey, 405 F.3d at 109 n.3 (citing Baldyga, 233 F.3d at 681). See also United States v. Veal, 153 F.3d 1233, 1252 (11th Cir. 1998). Here, the defendant did not contend that he lacked knowledge that his conduct might constitute a federal offense. In fact, the defendant testified that he knew that his assault on Trombly could "be a criminal matter . . . a federal civil rights matter."

-15-

insists that <u>Arthur Andersen</u> requires us to reassess our holding in <u>United States</u> v. <u>Baldyga</u> that "the requirements of [§ 1512(b)(3)]" are "satisfied" where "the possibility existed that [the witness's] communication would eventually occur with federal officials," 233 F.3d 674, 680 (1st Cir. 2000), and our holding in <u>Bailey</u> that "a federal investigation" need not be "imminent or underway at the time of the actus reus," 405 F.3d at 108.

In evaluating these contentions, we start with a review of the two subsections at issue. Subsections (b)(2) and (b)(3) share the state of mind language that the <u>Arthur Andersen</u> court interpreted:

> Whoever knowingly uses intimidation . . . or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person with intent to—

18 U.S.C. § 1512(b). Subsections (b)(2)(A) and (b)(2)(B), at issue in <u>Arthur Andersen</u>, prohibit engaging in the above-quoted conduct "with intent to—"

> cause or induce any person to . . . withhold testimony, or withhold a record, document, or other object, from an official proceeding [or] alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding . . .

18 U.S.C. §§ 1512(b)(2)(A); 1512(b)(2)(B)). Subsection (b)(3), which the defendant is accused of violating, makes it a crime to engage in the above-quoted conduct "with intent to—"

> hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense . . .

18 U.S.C. § 1512(b)(3). See also id. § 1515 (defining terms used in obstruction of justice statutes).

The first holding in Arthur Andersen -- that "knowingly" modifies "corruptly persuades" -- clearly interprets the common wording applicable to the two subsections and applies to a prosecution pursuant to subsection (b)(3). In interpreting the language shared by the two subsections, the Arthur Andersen court referred to the section generally, see Arthur Andersen, 125 S.Ct. at 2135 ("Section 1512(b) punishes. . ."), and explicitly referenced subsection (3) in a footnote. Arthur Andersen, 125 S.Ct. at 2135 n.8. The defendant correctly observes that Arthur Andersen mandates -- to prove the mens rea required by § 1512(b)(2) and § 1512(b)(3) -- a showing of "consciousness of wrongdoing." Arthur Andersen, 125 S.Ct. at 2136.

The second holding, concerning the "nexus" requirement, does not translate so easily to a prosecution under subsection (b)(3). While the Arthur Andersen court required a "nexus between the 'persua[sion]' to destroy documents" and some "particular official proceeding in which those documents might be material," id. at 2136-37, subsection (b)(3) does not refer to an "official proceeding." Instead, it refers to a defendant intending to

-17-

hinder, delay, or prevent communication to a "law enforcement officer or judge of the United States."  The defendant does not explain how subsection (b)(3) might sensibly be read to require a defendant to "contemplate" -- to use the term in Arthur Andersen -- a "particular" "law enforcement officer or judge of the United States" in the same way that one might "contemplate" "any particular official proceeding."  Arthur Andersen, 125 S.Ct. at 2137.

While perhaps one might argue that the inclusion in subsection (b)(3) of "the communication to a . . . judge" may refer to a judge hearing evidence in some kind of official proceeding -- we certainly do not decide the issue -- "the communication to a law enforcement officer" easily encompasses an earlier and less formal investigation than that contemplated by subsection (b)(2).  Unlike subsection (b)(2) and 18 U.S.C. § 1503, which protect particular "official proceedings," see Aguilar, 515 U.S. at 599-600, subsection (b)(3) protects the general ability of law enforcement agents to gather information relating to federal crimes (and the witnesses who desire to speak truthfully to law enforcement agents about those crimes).  As one of our sister circuits has concluded, subsection (b)(3) "does not connect the federal interest with an ongoing or imminent judicial proceeding," United States v. Veal, 153 F.3d 1233, 1249 (11th Cir. 1998), but rather "'speaks more broadly'" to "the character of the affected

-18-

activity, the transmission of information to federal law enforcement agents," id. at 1251 (11th Cir. 1998) (quoting United States v. Shively, 927 F.2d 804, 812 (5th Cir. 1991)) (rejecting as "misguided" an argument that the nexus requirement articulated in Aguilar applies to subsection (b)(3)).

Also, the statute explicitly disclaims any requirement that the defendant knew that the "communication . . . of information relating to the commission or possible commission of a Federal offense" would be made to a federal official. 18 U.S.C. § 1512(g)(2).[5] See Baldyga, 233 F.3d at 680 ("We also want to dispel any notion that the defendant's intent . . . must include an awareness of the possible involvement of federal officials."). In light of the disclaimer in subsection (g)(2), a defendant may be held strictly liable under subsection (b)(3) for the happenstance that a federal law enforcement agent rather than, say, a local police officer or internal affairs specialist investigated his conduct. See United States v. Applewhaite, 195 F.3d 679, 687 (3d Cir. 1999) ("One who attempts to corruptly influence an investigation takes his or her witnesses and investigation as he or she finds them."). Given the statutory language, we doubt that a defendant is beyond the purview of subsection (b)(3) merely because he expected the witness he tampered with to be interviewed by State

---

[5] Formerly 18 U.S.C. § 1512 (f)(2).

-19-

Officer X in particular, but the witness actually was contacted by Federal Agent Y. See Veal, 153 F.3d at 1252-53 & n.27.

In the end, we need not resolve the exact contours of any nexus requirement in subsection (b)(3). Indeed, the Arthur Andersen court did not elaborate on the particularity required by the nexus requirement in subsection (b)(2). There is simply nothing in Arthur Andersen that helps the defendant, who specifically and by his own words linked his intent to tamper with all four witnesses to the particular federal inquiry into his commission of a federal offense that eventually resulted in his prosecution. If the defendant's contention is that the government must prove "'the possible existence of a federal crime and a defendant's intention to thwart an inquiry into that crime by officials who happen to be federal,'" Bailey, 405 F.3d at 108 (quoting United States v. Perry, 335 F.3d 316, 321 (4th Cir. 2003)), we continue to agree.[6] If the defendant suggests that Arthur Andersen requires a heightened showing of a nexus in a § 1512(b)(3) prosecution, between the intent to hinder communication and a particular law enforcement agency, we express our doubts but defer any final judgment for a future case that requires resolution of that issue.

_____

[6] Like our sister circuits, we have referred in our discussions of § 1512(b)(3) to "investigations," although the statute does not include that word. See Bailey, 405 F.3d at 108; Baldyga, 233 F.3d at 681. See also Perry, 335 F.3d at 321; Applewhaite, 195 F.3d at 687; Veal, 153 F.3d at 1254-55.

-20-

3.  Application to the facts

Peckham testified that, within a week of the incident, the defendant approached him to say that "he talked to the captain and everything's all set, that he did the prebooking and the booking.  And then he said 'don't worry about it.  You guys don't know nothing.'"  When Peckham noted that his own name was on Trombly's booking sheet, the defendant responded, "'Okay, then just say I did the prebooking and started the booking, and you came in halfway through the booking and finished the booking and put him in his cell."  Peckham testified further that the defendant "told us to say nothing" to investigators.  Finally, Peckham testified that, on the defendant's instruction, he relayed the same information to Lynch.

Lynch testified that he was given "a message" from the defendant by Peckham "that we had to say that nothing happened, the incident never happened."  Lynch testified that on another occasion the defendant told him "that the feds were in the station earlier today and not to talk about it in our car."  Lynch was not able to remember when either of these conversations occurred.

Harrigan testified that, some days or weeks after the incident with Trombly on September 9th, the defendant told him that "the FBI was investigating the incident" and that "nothing happened."

Straub testified that sometime before October 3rd, the defendant "came up to me and stated that Internal Affairs was investigating the thing that happened with the kid that night. They found nothing, but it's being investigated by the feds or the FBI, and nothing — nothing happened that night." Straub also testified that the defendant told her that the US Attorney's Office was involved, and that "all you know is that you were on the street that night."

The evidence was sufficient to warrant all four of the convictions for witness tampering. Peckham testified that the defendant asked him to lie to investigators, and the evidence allowed the jury to find that the defendant persuaded Peckham "in contemplation" of a likely federal investigation into his criminal conduct.[7] The evidence allowed the jury to find that the defendant

_____

[7] The defendant argues at length that, under his reading of the subsection (b)(3) nexus requirement, the evidence could not have supported a conviction for tampering with Peckham, because the defendant's conversations with Peckham occurred within a week of the assault on Trombly -- before the federal investigation into the defendant's conduct commenced. To the contrary, even though the defendant did not refer to the federal authorities in his conversations with Peckham, there was evidence that allowed the jury to conclude that he tampered with Peckham because he feared a federal investigation in particular. The defendant testified that he knew within a few days after the incident that there had been a well-publicized complaint against him for using excessive force on an arrestee, which he knew could be a federal crime. Additionally, because an officer in the Police Department's anti-corruption unit testified that "it's generally understood within the [Boston Police] Department" that the federal government may become involved in investigating allegations of excessive force by a police officer, the jury could have found that the defendant specifically contemplated that the investigation into his conduct likely would

-22-

corruptly attempted to persuade Lynch, Straub, and Harrigan to lie to or withhold information from federal investigators that he knew were probing his assault on Trombly. The jury also could find that the defendant knew that his assault on Trombly could "be a criminal . . . federal civil rights matter." This evidence was sufficient to warrant a conviction under any conceivable reading of the statute.

The defendant contends that Lynch's testimony that the defendant said "the feds were in the station earlier today" is "not credible as a matter of law" because there was "undisputed" evidence that the federal authorities did not visit the station house until October 3, after the defendant had been reassigned to another location. The defendant was entitled to make such an argument to the jury. But the jury was entitled to find that the defendant actually did make the comment and that it was indicative of his state of mind, even though he was wrong about the presence of federal agents in the police station before October 3.

## C. Sentencing

Before the district court, the defendant made a number of objections about that court's understanding and application of the sentencing guidelines. The defendant also asks that his sentence be vacated in light of Booker, noting that the district court made

---

include federal agents, even before the FBI actually became involved. The defendant does not argue that the government was required to prove more.

comments at sentencing indicating that he might have ordered a different sentence in the absence of a mandatory sentencing guidelines regime.

### 1. Interpretation of the Guidelines

We doubt that Byrne has preserved on appeal his objections to the guideline calculations, but out of an abundance of caution and because it does not change the result, we have addressed his arguments. The district court ruled that the base offense level for a civil rights violation involving force, committed by one person acting alone, is the greater of ten or the base offense level for the underlying crime. U.S.S.G §2H1.1(a). Here, the district court concluded that the underlying crime was aggravated assault — assault causing serious bodily injury — a base level fifteen offense. U.S.S.G §2A2.2(a). The district court then applied twelve levels of enhancements: four because the aggravated assault involved serious bodily injury, U.S.S.G. §2A2.2(b)(3)(B), see United States v. Newman, 982 F.2d 665, 671-675 (1st Cir. 1992), six because the defendant was a public official or acted under color of law, U.S.S.G. §2H1.1(b), and two because the defendant obstructed justice, U.S.S.G. §3C1.1. These calculations netted a base offense level of 27 and, given the defendant's lack of a criminal record, a guideline range of 70 to 87 months of imprisonment. The court imposed the shortest sentence within that range.

The defendant objected to the guideline calculations on three principal grounds. Two of these are easily dispensed. The defendant's suggestion that the assault on Trombly did not cause serious bodily injury is preposterous. As a result of the defendant's assault on him, Trombly required emergency surgery and then had his jaw wired shut. Similarly unavailing is the defendant's argument that the evidence did not support the two-level enhancement for obstruction of justice because the guidelines require that the obstruction occur "in the course of" an investigation, rather than, as the obstruction statute allows, "in contemplation" of a "communication." We doubt that there can be a situation in which the evidence is sufficient to support an obstruction of justice conviction but not an obstruction of justice enhancement. Even so, there was plentiful evidence that an investigation into the defendant's conduct commenced before he obstructed justice.

The defendant is also incorrect that the "cross-referencing" provision of U.S.S.G. §2H1.1(a)(1), which fixes the base offense level at the higher of ten or the base offense level for the underlying crime, should not apply in cases where U.S.S.G. §2H1.1(a)(3), which governs civil right violations involving "the use or threat of force," might be applicable. Section 2H1.1(a)(3) provides a floor, not a ceiling. The logic of the provision can be inferred from civil rights violations involving underlying offenses

such as sexual assault and murder, which the "cross-referencing" provision ensures carry far higher base offense levels than civil rights violations involving only minor force or the threat thereof. The Sentencing Commission intended that crimes like the defendant's be punished at least as severely as if they had occurred under federal jurisdiction but not during a civil rights violation.[8] Courts of appeals have applied §2H1.1(a)(1) accordingly. See, e.g., United States v. Allen, 341 F.3d 870, 894-95 (9th Cir. 2003) (approving cross reference to aggravated assault for base offense level); United States v. Webb, 252 F.3d 1006, 1010 n.6 (8th Cir. 2001) (concluding that it would be an error of law to fail to apply higher base level of cross-referenced offense); United States v. Velazquez, 246 F.3d 204, 209 (2d Cir. 2001) (discussing cross-referencing to homicide offenses in civil rights sentencing of prison guard who killed inmate).

2. Booker error

The defendant made no timely Sixth Amendment objection to his sentence. Accordingly, we review his Booker claims pursuant to United States v. Antonakopoulos. 399 F.3d 68, 79-80 (1st Cir. 2005). We examine whether the defendant can show that he might have received a lesser penalty if the guidelines had been deemed advisory at the time he was sentenced. Id. at 78-79. Our inquiry

---

[8] When, as here, civil rights violations are committed under color of law, by a public official, U.S.S.G. §2H1.1(b)(1) advises a separate and distinct enhancement.

into the defendant's prospects for a lesser sentence is not "overly demanding." United States v. Heldeman, 402 F.3d 220, 224 (1st Cir 2005). We will allow the district court the opportunity to reevaluate the defendant's case as long as "there is reasonable indication that the district judge might well have reached a different result under advisory guidelines." Id.

In this case, the district court expressed hesitations about sentencing the defendant within the guideline range and sentenced the defendant to the shortest permissible term within that range. The court noted twice that it took "no pleasure" in the sentence and took pains to express misgivings that "I do not have the discretion that a state judge does." And, while the court condemned the defendant's conduct as "unprovoked" and unjustified, the sentencing colloquy also expressed sympathy for the "unique" position of police officers. It is unclear to us just what circumstances may have provoked the district court's sympathy. But there may be circumstances of which we are unaware, and in any event, the main question right now is the likelihood that the district court may be inclined to give a lower sentence. Given all of the circumstances here, we vacate the sentence and remand for resentencing.

## III.

For the reasons stated above, we **affirm** the defendant's convictions.  We **vacate** the defendant's sentence and **remand** for resentencing.

So ordered.