# United States Court of Appeals
## For the First Circuit

No. 05-2256

UNITED STATES,

Appellee,

v.

DEREK CAPOZZI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Selya, Circuit Judge,

Campbell, Senior Circuit Judge,

and Lynch, Circuit Judge.

Terrance J. McCarthy on brief for appellant.
Timothy Q. Feeley, Assistant United States Attorney, Michael
J. Sullivan, United States Attorney, Christopher F. Bator,and
Ernest S. Dinisco, Assistant United States Attorneys, on brief for
appellee.

May 23, 2007

**CAMPBELL**, **Senior Circuit Judge**.  Defendant Derek Capozzi appeals from his convictions in the United States District Court for the District of Massachusetts for Hobbs Act conspiracy, witness tampering conspiracy, and being an accessory after the fact to witness tampering killing.[1]  Capozzi makes three major contentions on appeal:  (1) that the government's concession that the evidence was insufficient to establish two of the three objects of a multi-object conspiracy to violate 18 U.S.C. § 1512, the witness tampering statute, warrants a new trial; (2) that the district court erred in denying Capozzi the right to confront a government cooperating witness with the theory that his reward in exchange for testifying included avoidance of the death penalty; and (3) that his Hobbs Act conspiracy conviction must be vacated because there was insufficient evidence before both the grand jury and the petit

___

[1]A short while before scheduled oral argument of this case, Capozzi moved on several occasions to have his appointed counsel disqualified, to have counsel's brief stricken from the record, and to preclude his counsel from presenting oral argument.  After this court denied Capozzi's various motions, his counsel moved to withdraw.  We granted that motion on November 9, 2006 and, having determined that the decisional process would not be significantly aided by oral argument, we directed that the case be submitted on the existing briefs.  Capozzi subsequently filed several motions directing our attention to portions of the record; our decision today is based on a thorough review of the record on appeal.  He additionally filed a further motion to reconsider striking his counsel's brief, arguing, inter alia, that counsel had inaccurately argued his first point on appeal.  We denied that motion.  To the extent Capozzi sought in the motion to make a different argument related to his first claim on appeal here, we have considered that argument below in addition to the arguments presented in the appellant's brief.  See note 2, infra.

jury.  After a careful review of the trial record, we affirm Capozzi's convictions.

## Background and Facts

Capozzi was a member of a drug organization led by co-defendant Paul A. DeCologero (known as the "DeCologero Crew" and sometimes referred to herein as the "crew").  Along with distributing drugs, the crew used force to gain control of Boston's drug trade and murdered a nineteen-year-old woman, Aislin Silva, when crew members thought she might betray them.

In October 2001, DeCologero and six associates, including the defendant here, were charged in a 23-count indictment with criminal racketeering in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c) (2000); conspiracy to violate RICO, id. § 1962(d); and a number of related crimes.  In addition to the RICO counts, the indictment specified a number of federal crimes charged in separate counts involving drugs, guns, robberies, and, in the case of Silva, murder for the purposes of witness tampering.  See generally United States v. DeCologero, 364 F.3d 12 (1st Cir. 2004) (affirming denial of DeCologero's motion to dismiss on double jeopardy grounds and reversing district court's order removing several racketeering acts from the trial of the RICO case).

Capozzi was charged in Counts 1 and 2 (RICO conspiracy and substantive charges, in violation of 18 U.S.C. § 1962(c) and

(d)); Count 3 (witness tampering conspiracy, in violation of 18 U.S.C. § 371); Count 4 (witness tampering, in violation of 18 U.S.C. § 1951(a)); Count 7 (accessory after the fact to witness tampering killing); Count 8 (Hobbs Act conspiracy, in violation of 18 U.S.C. § 1951(a)); Count 9 (Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a)); Count 10 (possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1)(A)); Count 11 (using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)); and Count 19 (felon-in-possession of a firearm, in violation of 18 U.S.C. § 922(g)(1)).

One of Capozzi's co-defendants, John P. DeCologero, Sr., pled guilty to a RICO offense on February 28, 2003. On July 20, 2004, Capozzi moved to disqualify the counsel for three of his co-defendants on the grounds that they had conflicts of interest. As a result, counsel for co-defendants Paul A. Decologero, John P. DeCologero, Jr., and Paul J. DeCologero withdrew from the case and were replaced by successor counsel. Because of the amount of time new counsel would need to prepare for trial, the government moved to sever Capozzi from his co-defendants, sever trial of the RICO charges and substantive witness tampering charge for a later date, and try Capozzi on the remaining charges beginning on September 24, 2004, the date on which the RICO trial had been scheduled to begin. The court granted the motion and on September 27, 2004 began trial against Capozzi on the Hobbs Act conspiracy, robbery, drug and

-4-

firearms counts, with another trial to follow on the witness-tampering and murder-related counts.  Capozzi elected to represent himself at trial (and throughout most of the pretrial proceedings), with standby counsel appointed by the court.

The counts before the jury in the first trial were Count 8 (Hobbs Act conspiracy), Count 9 (Hobbs Act robbery of a drug dealer, Michael Stevens), Count 10 (possession of marijuana with the intent to distribute), Count 11 (using a firearm during and in relation to the Stevens robbery), and Count 19 (felon-in-possession of a firearm).  On October 13, 2004, the jury convicted Capozzi of the Hobbs Act conspiracy charge (Count 8) and acquitted him on the felon-in-possession of a firearm charge (Count 19).  The jury failed to reach a unanimous verdict on the Stevens robbery and related charges (Counts 9, 10, and 11), and the court declared a mistrial as to those counts.

Capozzi's second trial, on the witness tampering and murder-related counts, began on April 25, 2005, with Capozzi still representing himself, again with standby counsel.  Before the jury were Count 3 (witness tampering conspiracy), Count 4 (witness tampering by misleading conduct), and Count 7 (accessory after the fact to witness tampering killing).  On May 10, 2004, the jury convicted Capozzi of witness tampering conspiracy (Count 3) and accessory after the fact to witness tampering murder (Count 7), and

-5-

acquitted him on the witness tampering by misleading conduct charge (Count 4).

On August 12, 2005, Capozzi was sentenced on the three counts of conviction to a total of 23 years' imprisonment. Upon imposition of the sentence, the government dismissed the RICO counts (Counts 1 and 2), and the counts related to the Stevens robbery on which the first jury had deadlocked (Counts 9, 10, and 11). Capozzi timely appealed from his convictions in both trials on August 16, 2005.

Evidence at Trial

The evidence at both trials showed that Paul A. DeCologero ("Paul A.") headed the DeCologero crew in 1995 and 1996. The crew, consisting mostly of his relatives and their close friends, dealt in cocaine and marijuana and stole from competing drug dealers. Cooperating witnesses for the government Thomas Regan and Stephen DiCenso testified to having themselves been members of the crew. They also identified as members Paul A. and co-defendants John P. DeCologero ("John Sr."), John P. DeCologero, Jr. ("John Jr."), Paul J. DeCologero ("Paul J."), Kevin Meuse ("Meuse"), and Capozzi. John Sr. and Paul A. are brothers, and John Jr. and Paul J. are John Sr.'s sons and Paul A.'s nephews. Meuse joined the crew in September 1996. Capozzi, a friend of Meuse, joined the crew at Meuse's invitation in October 1996.

i. First Trial

At the first trial, the evidence showed that when Meuse and Capozzi joined the crew in the fall of 1996, the other crew members were already engaged in a conspiracy to rob area drug dealers of drugs, money, and weapons. DiCenso testified about a spring 1996 robbery of a local marijuana dealer, Jeff North, which DiCenso had helped to plan with the approval of Paul A., and which two others committed on Paul A.'s orders. DiCenso also testified that North had at least one drug customer in Maine who later became DiCenso's customer. Regan testified to having committed robberies and an attempted robbery of area drug dealers in the company of John Jr., Paul J., and Paul A., on orders from Paul A. in 1995 and 1996.

Both Regan and DiCenso admitted robbing Michael Stevens on Halloween night, 1996, on the orders of Paul A. Stevens was a high volume marijuana dealer in Tewksbury who was known by members of the crew to be a supplier for North. Regan and DiCenso testified that they committed the armed robbery at Stevens' residence with Meuse and Capozzi, and that they took money, marijuana, and a handgun. The victims of the robbery -- Stevens, his girlfriend, and a friend who came to the house during the robbery -- testified about the robbery and said that the masked robbers beat and threatened Stevens and bound all of their arms and legs and covered their eyes with duct tape. All three victims were

-7-

aware of only three robbers. DiCenso testified that he waited in the car while the other three robbers entered Stevens' townhouse and then joined them a few minutes later.

Capozzi asserted pro se in closing argument that Regan and DiCenso were lying about his own participation in the Stevens robbery, and that the victims correctly reported only three robbers that night (Regan, DiCenso, and Meuse). Additionally, he argued that the robbery of a local drug dealer did not "affect commerce," a required element of the crime. He finally argued there was insufficient evidence that the marijuana Stevens sold either came from or was sold outside Massachusetts. The jury did not reach a verdict for Capozzi on the Stevens-related counts (Counts 9, 10 and 11) but convicted him of Hobbs Act conspiracy to rob drug dealers along with other members of the DeCologero crew (Count 8).

ii. Second Trial

At the second trial, along with much of the same robbery evidence admitted at the first trial, Regan and DiCenso testified to a late October 1996 burglary of dealer North's apartment that they committed with Paul J. on Paul A.'s orders. They took money, marijuana, and a small arsenal of weapons and ammunition. Paul A. divided the money but told DiCenso to store some of the weapons and ammunition at the Medford apartment of a young woman, Aislin Silva, where Paul A. had recently been housing cocaine. About a week after the October robbery, Medford police heard that Silva had a

collection of weapons in her apartment.  On November 5, 1996, local police and ATF Special Agent John Mercer went to Silva's apartment, obtained her consent to search her apartment for weapons, and found a duffle bag of weapons under her bed.  Inside the bag were an automatic machine pistol, a .357 magnum revolver, and an AR-15 semiautomatic assault rifle, along with several hundred rounds of ammunition and two non-functioning hand grenades.  During the search, DiCenso and Paul J. arrived at Silva's apartment, were identified by police, and were then allowed to leave.

According to DiCenso, the night the weapons were seized, Paul A. gathered some of the crew together and had DiCenso take Silva to a local hotel so they could find out what she had told the police.  Paul A. concluded he needed more time to think through the situation, so he had DiCenso stay with Silva and gave him orders to keep her away from police.  After two days, Paul A. sent DiCenso and Silva to New York City for a long weekend and again gave DiCenso orders to keep Silva away from law enforcement and tell her that she needed to stay away until lawyers could handle the situation.

The crew gathered again when DiCenso and Silva returned to Boston on November 12, and Paul A. decided to kill Silva. DiCenso contributed to the final decision by telling Paul A. he did not think she would remain "solid."  Paul A. sent Paul J. to Lowell to buy high-grade heroin, planning to make Silva overdose.  Paul A.

gave the heroin to Meuse, and Meuse and DiCenso tried to get Silva to take an overdose quantity by telling her it was cocaine. The attempted overdose failed, and DiCenso and Silva stayed the night of November 12 at DiCenso's apartment. The next morning, Meuse arrived and sent DiCenso to the hardware store to buy a hacksaw and cutting shears. When DiCenso returned to the apartment, Silva was dead, and Meuse admitted he had broken her neck.

Meuse left the apartment and came back with Capozzi. The three dismembered Silva's body in the apartment's bathtub, stuffed the body parts into plastic garbage bags and then into duffle bags, and carried her remains to Capozzi's rental car. They drove to a Home Depot, where Capozzi and Meuse bought a shovel and lime and then drove to a location on the North Shore chosen by Capozzi, where they buried Silva's remains. They then drove to a car wash in Danvers to dispose of evidence and clean the car used to transport Silva's body. DiCenso went to a nearby Ann & Hope store and bought three pairs of sneakers to replace the ones worn during the burial of Silva's remains.

Physical evidence introduced at trial lent significant support to DiCenso's testimony. The day after Silva was killed, bloody plastic bags, duffle bags, and four empty lime bags, among other evidence, were found in and around a trash dumpster at the Danvers car wash in question. Meuse's fingerprint was found on one item. The blood, hair and tissue found on and in the plastic bags

were determined through DNA testing to belong to Silva. A Home Depot security video showed Capozzi pushing a shopping cart out of the store containing what looked like four bags of lime and Meuse leaving the store with a shovel. A receipt from the Danvers Ann & Hope found in DiCenso's wallet two days later showed that he purchased an iced tea at the store at about 9 p.m. on the night Silva was killed. Another Ann & Hope receipt showed that he purchased three pairs of sneakers and three sweat suits at about the same time.

As noted above, on May 10, 2004, the jury convicted Capozzi of Counts 3 and 7: witness tampering conspiracy and accessory after the fact to witness tampering murder, and acquitted him on Count 4, the witness tampering by misleading conduct charge.

## Discussion

Capozzi argues on appeal that the court erred in upholding his witness tampering conspiracy conviction (Count 3 in the second trial) after the government conceded there was insufficient evidence as to two of the three possible objects of the conspiracy. Second, he argues that he should have been permitted to cross-examine DiCenso regarding the benefit DiCenso allegedly received of not being subject to the federal death penalty. Finally, Capozzi asserts that his Hobbs Act conspiracy conviction should be vacated because (1) there were defects in the indictment; (2) the government failed to sustain its burden of

-11-

proof relative to the interstate nexus requirement; and (3) the district court erred in refusing to unseal the grand jury transcript.  We find no merit in any of these contentions.

A.  Witness Tampering Conspiracy

Capozzi appeals from his conviction in the second trial on Count 3, the multi-object witness tampering conspiracy.  He argues that the government's concession that two of the three asserted objects of the conspiracy (conspiring to attempt to kill Silva and engaging in misleading conduct towards her, as opposed to conspiring to kill her) were insufficiently supported by the evidence, combined with the general verdict returned by the jury, necessarily means he is entitled to a new trial on Count 3.

Count 3 charged Capozzi and four co-defendants with a violation of the general conspiracy statute, 18 U.S.C. § 371.  It alleged a multi-object conspiracy to violate various provisions of 18 U.S.C. § 1512, the federal witness tampering statute.  The charging language of Count 3, as it went to the jury, included in relevant part the following:

> the defendants herein, and co-conspirator Kevin Meuse [now deceased] did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree with one another and with others known and unknown to the grand jury, to commit offenses against the United States; that is, to kill and attempt to kill another person and to engage in misleading conduct toward another person, with intent to hinder, delay, and prevent the communication to a law enforcement officer of the United States relating to the commission or possible commission of federal offense, . . . in violation of Title 18 United States Code, Sections 1512(a)(1)(c), 1512(b)(3), and 2.

-12-

The indictment followed the usual practice of using the conjunction "and" in reference to the planned offenses, but guilt can be established by adequate proof on any one of the three charged grounds. See Griffin v. United States, 502 U.S. 46, 51, 59-60 (1991) (holding that the Due Process Clause does not require a general guilty verdict on a multi-prong conspiracy be set aside if the evidence is inadequate to support conviction as to one of the objects).

The district court properly instructed the jury that guilt must be based upon proof of an agreement to commit any one of the three objects of the conspiracy and that the jury had to be unanimous as to which if any of the three objects were proved beyond a reasonable doubt. Before the case went to the jury, Capozzi requested a special verdict on Count 3, arguing that a special verdict was needed in order to clarify sentencing issues, specifically the application of the advisory sentencing guidelines. The court denied the request. Capozzi did not then assert that a special verdict was needed to evaluate the sufficiency of the evidence as to each object of the conspiracy, nor did he claim in a post-verdict Fed. R. Crim. P. 29 motion for acquittal that the conviction needed to be set aside because the government had failed to prove one or more of the three objects. He argued only that there was insufficient evidence to support each of the three objects of the witness tampering conspiracy, not that a general

-13-

verdict prevented a determination of which prong of the conspiracy the jury really focused on in convicting him.

In response to Capozzi's motion for acquittal, the government conceded there was insufficient evidence offered at trial to establish that Capozzi agreed to the commission of witness tampering by misleading conduct or by the heroin overdose attempted killing of Silva. But the government contended there was ample evidence to support the first charged object of the alleged witness tampering conspiracy, to wit, the successful killing of Silva. This being so, the Count 3 conviction fell within the well-established principle repeated by this court in United States v. Murray: "When a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, the verdict stands if the evidence is sufficient with respect to any one of the acts charged." 621 F.2d 1163, 1171 n.10. See Griffin v. United States, 502 U.S. 46, 51, 59-60; see also Turner v. United States, 396 U.S. 398, 420 (1970); United States v. Richman, 600 F.2d 286, 298 (1st Cir. 1979).

As a preliminary matter, the government argues that Capozzi forfeited his claim on this issue by failing to raise it at the district court level. See United States v. Lilly, 13 F.3d 15, 17-18 (1st Cir. 1994) ("arguments not seasonably addressed to the trial court may not be raised for the first time in an appellate venue"). Because he did not preserve the particular claim related

-14-

to the general verdict issue, we review his arguments only for plain error.  No matter the standard, however, Capozzi's claim fails.

On appeal Capozzi no longer argues, as he did below, that there was insufficient evidence as to all three objects of the conspiracy.  In fact, in his appellate brief he writes, "[i]t is apparent that the verdict in this matter is required to be set aside because it is un-supportable on two ground[s], but not another, and it is impossible to tell which ground the jury selected" (emphasis supplied).  He thus effectively concedes that there was sufficient evidence for the jury to find beyond a reasonable doubt that he joined a conspiracy to engage in witness tampering by killing Silva.  Capozzi instead relies on Yates v. United States, 354 U.S. 298 (1957), for his argument that the general verdict does not demonstrate whether the jury convicted on a reasonably supported basis.

The Supreme Court distinguished Yates in its later decision in Griffin, 502 U.S. at 56.  The issue in Griffin was "whether, in a federal prosecution, a general guilty verdict on a multiple-object conspiracy charge must be set aside if the evidence is inadequate to support conviction as to one of the objects."  Id. at 47 (emphasis supplied).  The Griffin Court distinguished Yates and its prior decision in Stromberg v. California, 283 U.S. 39 (1931), as dealing with general verdicts in which there were legal

-15-

or constitutional (but not merely evidentiary) defects in one of several charged means that may have supported the jury's verdict. Griffin, 502 U.S. at 536-56. The Griffin Court relied on its post-Yates holding in Turner that "when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, as Turner's indictment did, the verdict stands if the evidence is sufficient with respect to any one of the acts charged." Griffin, 502 U.S. at 56-7 (citing Turner, 396 U.S. at 420). Here, where the evidence was sufficient as to one prong of the three-pronged charged conspiracy (and Capozzi does not argue otherwise on appeal), Griffin makes clear that the district court did not err in upholding Capozzi's conviction on Count 3.[2]

---

[2]As noted, after the completion of appellate briefing, Capozzi filed a renewed motion to strike his counsel's legal brief on the ground that counsel made an improper legal argument on Count 3 by focusing on evidentiary sufficiency instead of legal error in the indictment. Capozzi urges us now to consider an argument he previously made pro se to the district court in a belated new trial motion in which he cited, besides Yates, our decision in United States v. Boots, 80 F.3d 580 (1st Cir. 1996) (a legal error in the substantive crime charged required reversal on the conspiracy charge, following Yates). We have consistently held that arguments not raised in the initial appellate legal brief are considered waived. See United States v. Pizarro-Berrios, 448 F.3d 1, 5 (1st Cir. 2006). And it is also very doubtful whether the argument Capozzi now seeks to make pro se was preserved below. But even were we to reach the substance of Capozzi's pro se argument, it fails. Capozzi appears to argue that the indictment was legally flawed because it is impossible to charge a conspiracy both to attempt to kill and to kill. But especially where, as here, the government charged a conspiracy to attempt to kill Silva and a distinct, successful killing after the heroin overdose attempt had failed, there is no reason the attempt crime and the substantive offense could not both be charged in the indictment. There was no legal error in the charge.

B.  Sixth Amendment Right to Confrontation

Capozzi next challenges a restriction placed by the district court on his cross-examination of DiCenso in both trials. He argues that the court violated his Sixth Amendment right to confrontation by preventing him from seeking to establish that DiCenso benefitted from his plea agreement with the government by not being prosecuted under the federal death penalty statute.  We hold that such restriction as was placed on the cross-examination of DiCenso did not violate Capozzi's Sixth Amendment rights and was within the court's discretion to impose.

i.  Background

As a result of statements Silva made to friends before weapons were found in her apartment, and some other evidence, DiCenso was charged by criminal complaint in February 1997 with being a felon in possession of the recovered guns.  Because of health problems stemming from a November 1996 heroin overdose and following his motion for a competency evaluation under 18 U.S.C. § 4241 et seq., DiCenso was examined by mental health professionals and found incompetent to stand trial.  The government thus dismissed the complaint on June 27, 1997.

Following dismissal of the firearms complaint, DiCenso lived at his mother's home and spent a great deal of time in internet chat rooms.  ATF agent Mercer, acting in an undercover capacity and using a female identity, "Julie," engaged in a lengthy

online "relationship" with DiCenso.  More than 400 pages of chats and emails were preserved by Mercer and provided to a psychiatrist for an evaluation of DiCenso's competency during that period.  On June 30, 1999, the government filed a second felon-in-possession complaint against DiCenso.  After lengthy competency proceedings, DiCenso was found competent for trial.

The government then began to discuss with DiCenso his possible cooperation.  On October 12, 2000, the parties signed a proffer agreement, and lengthy debriefings (or "proffers") followed.  The proffers, protected by direct use immunity,[3] included DiCenso's admissions of his own involvement in the murder, dismemberment, and burial of Silva.  On October 6, 2001, DiCenso signed a plea and cooperation agreement with the government.  DiCenso then pled guilty to a one-count information charging him with a substantive violation of RICO, 18 U.S.C. § 1962(c).  The racketeering activity charged in the RICO information included conspiracy to murder, attempted murder, and aiding and abetting murder, as well as Hobbs Act conspiracy, Hobbs Act robbery and related offenses stemming from the robberies of Michael Stevens, Alfred Sapochetti, and Jeffrey North, and marijuana and cocaine conspiracies.  The maximum punishment for a RICO violation is 20

---

[3]Direct use immunity allows the government to use information derived from a witness's statements but forbids the use of the information in those statements against the witness in subsequent prosecution.  See United States v. Plummer, 941 F.2d 799, 803 (9th Cir. 1991).

years' imprisonment, increased to life "if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." 18 U.S.C. § 1963(a). In DiCenso's case, aiding and abetting state law murder and federal witness tampering killing, both charged as racketeering acts in the information, are punishable by life imprisonment. Mass. Gen. Laws ch. 265, § 1; id. ch. 274, § 2; 18 U.S.C. §§ 1512(a)(3)(A), and 2.

DiCenso's plea agreement stated that he faced a minimum and maximum punishment of life imprisonment under the information. The then-mandatory sentencing guidelines called for a guideline sentencing range of life. U.S.S.G. § 2A1.1 (first degree murder). The plea and cooperation agreement also provided for a departure motion to be made by the government for substantial assistance, pursuant to U.S.S.G. § 5K1.1, and a departure motion to be made by DiCenso based on his physical impairments, pursuant to U.S.S.G. § 5H1.4.

As noted earlier, Capozzi's first trial focused on the robbery, drug and firearms charges because the district court severed the trial of these counts from the witness tampering/murder-related counts in order to avoid possible prejudice to Capozzi because of the time needed by co-defendants' newly retained counsel to prepare. Because at the time of the first trial, DiCenso stood convicted (by his guilty plea) of a RICO offense and would be subject to impeachment on that basis, and the

facts of the murder would not be otherwise admissible in the first trial,[4] the government moved in limine to preclude cross-examination about the specific racketeering acts in the information and the offense conduct underlying those acts. The court ruled that Capozzi could elicit the specific racketeering acts during his cross-examination of DiCenso but could not go into the underlying offense conduct relating to the murder of Silva. During the discussion about Capozzi's planned cross-examination, Capozzi informed the court that he intended to establish that DiCenso was charged with a death eligible offense and that he was benefitting under his plea agreement because the government did not seek the death penalty.

A lengthy discussion followed. Capozzi claimed the maximum penalty for RICO was based on the underlying racketeering activity, and if the underlying racketeering activity (here, witness tampering killing) was punishable by death, then RICO was punishable by death. There is, however, no provision for a death penalty sentence for a RICO conviction. 18 U.S.C. § 1963(a). Capozzi further argued that if the government had elected not to

---

[4]The government successfully argued that under Fed. R. Evid. 609(a)(1), Capozzi was not permitted to cross-examine Dicenso on the underlying facts of his conviction, only on the conviction for the RICO offense itself. See, e.g., Cummings v. Malone, 995 F.2d 817, 826 (8th Cir. 1993) ("The ability to introduce the specific crime is not a license to flaunt its details, however; cross-examiners are limited to eliciting the name, date and disposition of the felony committed").

pursue the death penalty on the RICO offense charged against DiCenso, that was a benefit that DiCenso received from his cooperation, and Capozzi should be able to establish it before the jury. In response, the government argued that DiCenso had never been vulnerable to the death penalty, and that the government's evidence that DiCenso had aided and abetted in Silva's murder came from his protected proffer statements, which the government could not use against him without his consent. Capozzi argued that information from another defendant, Jason Stone, showed DiCenso's involvement in the murder, but the government responded that Stone's testimony would not "enlighten the court as to who it was that actually killed Ms. Silva."

During the discussion about death penalty eligibility, counsel for DiCenso, George Gormley, entered the courtroom, and the district court inquired whether DiCenso and his counsel thought that DiCenso was death eligible at the time of the plea and cooperation agreement. DiCenso's counsel responded that DiCenso was never thought to be vulnerable to the death penalty, that the death penalty was never discussed during plea negotiations, and the absence of a death eligible offense in the information was not, in his view, a benefit received by DiCenso in consideration for his cooperation with the government.

The court ruled, "Mr Capozzi may go into the predicate acts, he may not go into the conduct under the predicate acts. Do

you understand?  Just what they were charged, what the predicate acts are, which include conspiracy to murder, attempt to murder, and a bunch of others."  The court also had the following colloquy with Capozzi:

> The court:  You can ask him about racketeering acts 1 through 8 and what the benefit is he gets from having pled to those and to one life sentence, to the maximum of one life sentence, which of course, is likely to be reduced when he's actually asked.
>
> Capozzi:  The maximum is the death penalty.
>
> The court:  Life.
>
> Capozzi:  The statute says death.  That's misleading to the jury.
>
> The court:  Well, I mean you can ask about that if you want.  But I'm going to tell the jury that, as best as I understand it, it is life imprisonment.
>
> . . . .
>
> Capozzi:  We don't know what [punishment] Mr. DiCenso thought he was exposed to.
>
> The court:  But that's what you're entitled to ask him about.
>
> Capozzi: Exactly.  But I'm prevented now from asking him questions is my issue.
>
> The court:  No.  You're entitled to ask him what he thought his exposure was.  But we know from his counsel that his exposure, he thought, was not death.
>
> Capozzi:  But because I opened with this and now I'm being prevented from going into it, I would ask this court--I would now move for a mistrial.
>
> The court:  That's denied.  And you're not being prevented from getting into it.  You may not have the precise question that you want to ask.

Capozzi's cross-examination of DiCenso at the first trial established that DiCenso had pled guilty to what he believed was a mandatory sentence of life imprisonment, with the expectation that he could get a lower sentence based on his cooperation with the government, and that he hoped to receive a sentence of time served when his cooperation was complete. Capozzi also elicited testimony that DiCenso expected the pending firearms indictment related to the discovery of the guns from Silva's apartment would be dismissed based upon his cooperation. DiCenso further admitted having informed the government of substantial uncharged conduct, including drug dealing (marijuana and cocaine), robbing a drug associate of $100,000, and conspiring to kill a Mafia-related individual with a car bomb. DiCenso also admitted that he had pled guilty (in his RICO information) to the underlying racketeering activity of conspiracy to murder, attempted murder, and aiding and abetting murder, conspiracy to rob numerous individuals, robbing Michael Stevens, kidnaping Stevens and his friends, possessing marijuana with intent to distribute, robbing Al Sapochetti, aiding and abetting the kidnaping of Sapochetti and his friends, robbing Jeffrey North, and dealing cocaine.

Before the second trial, Capozzi filed a motion in limine related to DiCenso's alleged susceptibility to the death penalty. In addition to repeating the incorrect argument that the maximum penalty under the RICO statute was death, he argued that DiCenso

-23-

could have been charged, as was Paul A., with the substantive offense of witness tampering killing, a death eligible offense when the killing consists of murder as it did here. 18 U.S.C. § 1512(a)(3)(A). The government opposed the motion in a written submission. It contended, as previously, that the government could not have so charged DiCenso because DiCenso's proffer statements to the government, as well as his expected testimony at trial, could not be used by the government in any criminal prosecution of DiCenso given the direct use immunity granted DiCenso. Without DiCenso's protected statements, the government argued it did not have a chargeable case against DiCenso for aiding and abetting witness tampering murder. The district court denied Capozzi's motion without written opinion.

At the second trial, DiCenso's plea agreement was introduced into evidence. DiCenso testified that he committed each of the charged racketeering acts, and understood that his sentence would be life imprisonment unless it was reduced as a result of his cooperation with the government or his own physical impairments. He also acknowledged that whether he received a reduction for his cooperation was dependent upon the government's determining that his testimony was truthful.

ii. Analysis

The Supreme Court has held that it is a violation of the Confrontation Clause of the Sixth Amendment to preclude a defendant

entirely from all cross-examination about an event that a jury might reasonably have found furnished the witness a motive for favoring the prosecution. Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). But the Court also noted that:

> [i]t does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

Id.

We "review de novo the district court's conclusion that, even though cross-examination was limited, the defendant was afforded 'sufficient leeway to establish a reasonably complete picture of the witness' veracity, bias, and motivation.'" United States v. Byrne, 435 F.3d 16, 21 (1st Cir. 2006) (quoting United States v. Gonzalez-Vazquez, 219 F.3d 37, 45 (1st Cir. 2000)). If we determine that "the defendant's 'opportunity to impeach adverse witnesses' met or exceeded this constitutionally guaranteed 'threshold,' we review for abuse of discretion the district court's decision to '"impose reasonable limits" on cross-examination in order to avoid confusion of the issues or extended discussion of marginally relevant material.'" Byrne, 435 F.3d at 21 (quoting

Gonzalez-Vazquez, 219 F.3d at 45 (quoting United States v. Twomey, 806 F.2d 1136, 1139 (1st Cir. 1986))).

At the first trial, the district court plainly had discretion to prevent Capozzi from questioning DiCenso about the death penalty in the context of the RICO statute, which simply does not provide for it. Capozzi asked the court to allow him to establish that the RICO charge in the information to which DiCenso pleaded was potentially punishable by the death penalty and that DiCenso had avoided that possibility by cooperating with the government. But the maximum punishment provided for under the RICO statute is life imprisonment, not death. 18 U.S.C. § 1963(a). It is not a Sixth Amendment violation to keep a defendant from pursuing a line of cross-examination based on a mistaken view of the law.

At the second trial, the district court prevented Capozzi from inquiring about an uncharged offense carrying a possible death penalty, witness tampering murder, with which, Capozzi argues, DiCenso could have been charged. There was no evidence the government had ever threatened or said it meant to charge DiCenso with this offense, but Capozzi says he had a right to inquire whether avoidance of being charged with this potential death penalty offense formed a part of DiCenso's motive in cooperating with the government.

In responding to this argument, both here and below, the government insists that it never could have so charged DiCenso as it lacked the admissible evidence to make out a case of witness tampering murder. While DiCenso's own immunized testimony might have supported the charge, that testimony was not available to the government after the granting of use immunity. See Kastigar v. United States, 406 U.S. 441 (1972) (use immunity is coextensive with the scope of the privilege against self incrimination; any subsequent prosecution must prove that evidence proposed to be used derives from a legitimate source wholly independent from the compelled testimony).

Capozzi responds that the government had ample independent evidence to have charged DiCenso without his proffer, based on an affidavit prepared by Special Agent Mercer in 1999 and 2000, and trial testimony by a government informant, Jason Stone, implicating DiCenso in the murder. The government replies that while Stone's account of two conversations he had with Capozzi in 1997 and 1998 when Capozzi confessed to being an accessory after the fact to Silva's murder and implicated DiCenso was clearly admissible against Capozzi, it was not so clearly admissible against DiCenso. The district court excluded that "confession" evidence in the severed RICO trial of Capozzi's co-defendants. Moreover, Capozzi's "confession" to Stone implicated DiCenso only in post-murder conduct, not in the actual killing itself.

Regardless of the possible additional evidence against DiCenso, the fact remains that he was at no time charged with a death eligible offense, nor is there evidence that the government contemplated such a charge or threatened DiCenso with it.

We conclude that the district court did not commit constitutional error when it declined to allow Capozzi to inquire into the subject of DiCenso's avoidance of the potential death penalty attached to this uncharged crime which DiCenso had supposedly avoided by cooperating with the government. See Brown v. Powell, 975 F.2d 1, 5 (1st Cir. 1992). Moreover, without referring to the questionable, uncharged death eligible offense, Capozzi had considerable ammunition from the RICO offense actually charged from which to demonstrate that DiCenso had a powerful motive to testify in a manner supportive of the government. Knight v. Spencer, 447 F.3d 6, 13 (1st Cir. 2006) (to establish prejudice, first question is whether absent limit on cross-examination, "would the jury have received a significantly different impression of the witness's credibility?").

Utilizing the available evidence, Capozzi was able to explore thoroughly the implications of DiCenso's plea agreement at both trials. He demonstrated during his cross-examination that DiCenso had pled guilty to a crime punishable by life imprisonment, and that DiCenso's cooperation allowed him to be sentenced to a much lower sentence. DiCenso was shown to have had a powerful

motive -- avoidance of a life sentence and possibly of prison altogether -- to cooperate with the government and to testify falsely if necessary.  Whether he faced life imprisonment alone or an additional charge that could include the possibility of the death penalty, DiCenso plainly had a strong incentive to seek the deal with the government that he made, and to testify in support of the government's theory of the case.  See Brown, 975 F.2d at 4 (not a Sixth Amendment violation where jury not told that first degree murder carried a sentence of life without parole but otherwise "had more than sufficient information to conclude that [the witness] had a strong incentive to lie in order to receive a lesser sentence").  Thus we find no Sixth Amendment violation in the court's limitation.

Nor did the court's decision to bar the questioning constitute an abuse of its general discretion.  See Byrne, 435 F.3d at 22.  We have "long . . . recognized that trial courts retain '"wide latitude to impose reasonable limits" on cross examination in order to avoid confusion of the issues or extended discussion of marginally relevant material.'"  Id. (quoting Gonzalez-Vazquez, 219 F.3d at 45 (quoting Twomey, 806 F.2d at 1139)).  Any risk that DiCenso would have been charged with the death penalty offense was at best, for reasons already discussed, wholly speculative.  On the

record before us, the district court did not abuse its discretion in closing off the line of questioning on the death penalty.[5]

C.  Hobbs Act Conspiracy

Capozzi challenges his conviction from the first trial on Count 8, the Hobbs Act conspiracy charge pursuant to 18 U.S.C. § 1951(a).  Capozzi's main argument, which was rejected by the district court when it denied his Rule 29 motion for acquittal, challenges the sufficiency of the evidence supporting the "affects commerce" requirement of the statute.  He additionally challenges the district court's denial of pretrial motions which sought dismissal of the Hobbs Act charge based on a claimed lack of evidence presented to the grand jury.  Finally, he argues that the district court erred in denying his post-conviction motion to unseal grand jury minutes so that he could attack the sufficiency

---

[5] Capozzi makes an abortive argument that the government violated the requirement of United States v. Giglio, 405 U.S. 150 (1972), that the government disclose all material evidence to the jury by "failing to disclose the alleged promise made to its key witness that he would not be subject to death penalty prosecution if he testified for the government."  There are at least three problems with this argument.  First, it was not raised at the district court.  Second, no such promise seems to have been made, as questioning of DiCenso at trial and the plea agreement offered into evidence established.  Finally, the fact that DiCenso was not charged with a death eligible offense does not constitute Giglio material.  See United States v. Bender, 304 F.3d 161, 164 (1st Cir. 2002) ("Brady applies to material that was known to the prosecution but unknown to the defense.").  The absence of a death eligible offense charge would be apparent to anyone reading the information and was not information withheld by the government.

of the government's presentation of evidence to the grand jury. We find all three arguments to be lacking in merit.

### i. Sufficiency of the Evidence

Capozzi preserved his sufficiency of the evidence claim on Count 8, so we review the issue de novo. United States v. McCormack, 371 F.3d 22, 27 (1st Cir. 2004), cert. denied, 543 U.S. 1098 (2005). "The issue is whether a rational factfinder, considering all of the evidence in the light most favorable to the verdict, could have found beyond a reasonable doubt that [the Hobbs Act conspiracy] 'in any way or degree obstruct[ed], delay[ed] or affect[ed] commerce.'" Id. (citing 18 U.S.C. § 1951(a) and United States v. Boulerice, 325 F.3d 75, 79 (1st Cir. 2003) (standard of review for denials of Rule 29 motions)). We take a hard look at the record and "reject only those evidentiary interpretations and illations that are unreasonable, unsupportable, or overly speculative." United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995).

Count 8 charged Capozzi with conspiring to affect commerce by means of robberies, including but not limited to the robberies of nine named individuals. Capozzi contends that the evidence was insufficient to establish the "affects commerce" prong

of 18 U.S.C. § 1951(a),[6] arguing the government failed to prove that the drug dealers robbed were dealing interstate.

We have regularly held that commerce is "affected" for the purposes of the Hobbs Act if there is a "realistic probability of a de minimis effect on interstate commerce." United States v. McKenna, 889 F.2d 1168, 1171-72 (1st Cir. 1989). The government's required showing is "not onerous." United States v. DiGregorio, 605 F.2d 1184, 1191 (1st Cir. 1979). Even potential future effects may be the basis for interstate commerce jurisdiction under the Hobbs Act. McKenna, 889 F.2d at 1172 n.5.

"One common method for the government to establish the required 'de minimis effect' on interstate commerce is to show that the defendant's activity 'minimally depletes the assets of an entity doing business in interstate commerce.'" United States v. Capozzi, 347 F.3d 327, 337 (1st Cir. 2003) (quoting United States v. Nguyen, 246 F.3d 52, 54 (1st Cir. 2001)).

The government's evidence at Capozzi's first trial, which included Count 8, showed that each victim of an actual robbery was involved in the distribution of drugs from his residence. Each

---

[6]The text of the statute reads: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1951(a).

robbery or attempted robbery was designed to obtain illegal drugs and/or drug proceeds (and possibly firearms) from the victim. The evidence also established that the crew specifically targeted each robbery and attempted robbery victim because he was involved in the distribution of drugs in the crew's territory.

As conceded by Capozzi, Jeffrey North, one of the named victims in the conspiracy charge, was a high-volume marijuana dealer selling repeatedly to customers in both Maine and New Hampshire. Stevens testified about the quantities of marijuana he sold to North, and DiCenso and Stephen Butler, who drove North to Maine and New Hampshire to sell to his marijuana customers, testified about North's out-of-state marijuana business. Thus, without more, the conspiracy to rob drug dealers, at least one of whom had a substantial out-of-state marijuana business, had the possibility or potential of an effect on interstate commerce by depleting the assets of that interstate drug business. There was sufficient evidence here for the jury to find a violation of 18 U.S.C. § 1951(a), including the "affects commerce" prong.

ii. Grand Jury Sufficiency

Capozzi also argues that the district court erred in failing to order the release of the grand jury transcripts. Prior to trial, Capozzi moved to dismiss Count 8 (Hobbs Act conspiracy) and Count 9 (Hobbs Act robbery of Michael Stevens). He argued that the government had failed to present sufficient evidence to the

grand jury to establish the "affects commerce" element of the Hobbs Act charges. He did not then, and does not now, claim that the Hobbs Act charges were not properly pled in the indictment under Fed. R. Crim. P. 7(c)(1). The district court denied Capozzi's motion, stating that "The allegations are sufficient. The sufficiency of the evidence is for trial and the court should not inquire as to the sufficiency of the evidence before the grand jury."

A court called upon to determine whether grand jury transcripts should be released has substantial discretion. United States v. McMahon, 938 F.2d 1501, 1504 (1st Cir. 1991). It is "well settled that '[a]n indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits.'" United States v. Maceo, 873 F.2d 1, 2-3 (1st Cir. 1989) (quoting Costello v. United States, 350 U.S. 359, 363 (1956)). As we stated in Maceo, "A court should not inquire into the sufficiency of the evidence before the indicting grand jury, because the grand jury proceeding is a preliminary phase of the criminal justice process and all constitutional protections will be afforded during trial." Id. at 3. The government rightly argues that since Capozzi has never challenged the facial validity of Count 8, the district court

correctly rejected his attempt to attack the sufficiency of the evidence presented to the grand jury.[7]

### iii. Post-Trial Request for Grand Jury Transcripts

After both of his trials had ended, Capozzi filed motions to unseal the grand jury transcripts in the case. The district court denied both motions. Capozzi argued he needed the entire presentation to the grand jury in order to show that "no evidence," as opposed to "insufficient evidence," was presented to support the "affecting commerce" element of the Hobbs Act charges. On appeal, he again frames his attack on the grand jury proceedings in the language of subject matter jurisdiction of the district court, see note 7, supra. But his brief makes clear that he wishes to attack the sufficiency of the presentation to the grand jury. There is no reason, and Capozzi suggests none, why our holding in Maceo, supra, does not apply equally to a post-conviction attack on the sufficiency of a presentation to the grand jury. The trial went forward, Capozzi was afforded all constitutional protections, and

---

[7]Capozzi claims the alleged failure of the government to present to the grand jury an interstate commerce connection deprived the district court of jurisdiction and required the court to dismiss the Hobbs Act charges prior to trial. This argument, however, "confuses the constitutional limits on Congress' power with the jurisdiction of the federal courts: whether the facts of a given case present a sufficient nexus to interstate commerce to be regulated by Congress is not an issue of the federal court's subject matter jurisdiction." United States v. Cruz-Rivera, 357 F.3d 10, 13-14 (1st Cir. 2004). The district court correctly understood the issue to be one of sufficiency of the evidence before the grand jury.

a petit jury found him guilty beyond a reasonable doubt of Hobbs Act conspiracy after sound legal instruction. The "'indispensable secrecy of grand jury proceedings' must not be broken except where there is a compelling necessity." United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958). The burden of showing particularized need rests squarely on the defendant. Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395 (1959). Here Capozzi claims he needs the grand jury transcripts to present an appeal to this court of a non-justiciable issue: his incorrect claim that the court lacked subject matter jurisdiction and, more generally, his challenge to the sufficiency of the evidence before the grand jury. The district court properly denied his motion for the transcripts.

For the reasons discussed above, Capozzi's convictions are **affirmed**. All pending motions are denied as moot.